Charles BONEE, Administrator for the Estate of Roy Nolan Bonee, Plaintiff,

v.

L & M CONSTRUCTION CHEMICALS et al., Defendants.

No. 78–1039.

United States District Court, M. D. Tennessee, Columbia Division.

July 23, 1981.

---

Wayne Hairrell, Lawrenceburg, Tenn., Richard Swartz, Boston, Mass., for plaintiff.

William H. Lassiter, Jr. and Robert L. Trentham, Nashville, Tenn., for BCS and William Falls.

W. Harold Bigham, Nashville, Tenn., for Dayton Sure-Grip & Shore and Danis Industries.

## MEMORANDUM

WISEMAN, District Judge.

In this diversity action, plaintiff, administrator for the estate of Roy Nolan Bonee, a Tennessee resident, seeks damage relief from, among others, BCS Chemicals, Inc., [BCS], a now defunct Illinois corporation, Dayton Sure-Grip & Shore Company [Dayton], an Ohio corporation, Danis Industries, Inc., [Danis], an Ohio corporation, and William Falls. This Court has jurisdiction under 28 U.S.C. § 1332. Danis, Dayton, and Falls have moved for summary judgment. For the reasons stated below, the motions of Dayton and Falls are denied, and Danis' motion is granted.

### Facts

Although plaintiff suggests that disputed issues of fact exist that render summary judgment inappropriate, in the Court's view the facts relevant for determination of this motion are uncontested. *Woody v. Combustion Engineering, Inc.*, 463 F.Supp. 817, 819 (E.D.Tenn.1978).

On March 31, 1978, plaintiff's decedent, a maintenance employee of Scott County Memorial Hospital, was standing beside a coworker as the coworker tried to open an oil drum with a blow torch. The drum allegedly contained hydropel, a flammable construction sealer. The drum exploded. Plaintiff's decedent was burned severely and died from the injuries received in the explosion. According to the hospital supervisor, the drums bore no label indicating flammability. The issue at trial will inevitably boil down to whether the drums were properly labeled.

Until 1975 BCS was in the business of manufacturing, among other products, construction sealers. In the normal course of business BCS would label the drums with labels provided by the purchaser (Falls Dep. at 14). Hydropel was one of the sealers BCS made specifically for L & M Construction Chemicals, Inc., [L & M]. The hydropel formula resulted from a collaboration between BCS and L & M (Falls Dep. at 73). Although no one disputes that hydropel is a distinct brand of sealer, all architectural wall sealers do basically the same job and look and smell the same (Falls Dep. at 85).

In 1975 Dayton purchased all of the assets of BCS except some of its blending formulas and trade secrets. BCS existed as a mere shell for another year; its franchise expired in 1976 (Falls Dep. at 7). Prior to the purchase of the assets of BCS, Dayton did not produce construction chemicals. Dayton had been manufacturing and selling concrete construction supplies since 1924. Since acquiring the assets of BCS and hiring William Falls, Dayton manufactures a construction sealer similar to hydropel. The manufacture of Dayton's J26 waterproofing acrylic has a "slight difference in some of the raw materials [used and a] little bit of difference in the blending [process]" (Falls Dep. at 96).

Dayton's purchase of the BCS assets was part of a larger transaction in which the

assets of three corporations were purchased and certain liabilities of two corporations were assumed. Dayton bought substantially all of the assets of BCS, C & M Florida, and C & M Illinois.[1] William Falls owned 100 percent of the stock of C & M Illinois and BCS and 27 percent of the stock of C & M Florida. As part of the purchase agreement, Falls became a full-time employee of Dayton. Following the acquisition of these assets, Dayton opened a chemical division, which was managed by William Falls (Schimpf Dep. at 5). The chemical division operated the plants of the acquired companies (Schimpf Dep. at 18–19),[2] and sold its products to many of the former companies' customers (Schimpf Dep. at 22–25).

BCS conveyed its assets to Dayton pursuant to the following provision of the contract:

> At the closing, BCS shall assign, transfer and convey to Buyer [Dayton] all of the assets and properties of BCS, both tangible and intangible, including without limitation, all of its equipment . . . , all of its cash, inventory, accounts and notes receivable, trademarks, tradenames, licenses, contracts, leases, rights, and business, and its name and goodwill, EXCEPTING, however, its blending formulas and other trade secrets and the items in section 13 hereof [basically BCS' corporate books].

(Purchase Agreement at 2).[3]

Some of the formulas of BCS were transferred to Dayton as part of a license agreement.

BCS, largely through Falls as president of BCS, has developed and possesses valuable technical, engineering and sales information and know-how with respect to the formulas, all of which information and know-how are hereafter referred to as "Know-How."

. . . .

BCS hereby grants to DSG [Dayton] the exclusive right and license to produce, manufacture and sell, and to sublicense others to produce, manufacture and sell, any and all products based on the Formulas and the Know-How . . . . During the term of this Agreement, BCS shall furnish all the Know-How to DSG, including all new developments related thereto of which it or Falls acquires knowledge.

. . . .

Falls represents and warrants that the Formulas and Know-How comprise *all* of the chemical blending formulas and information related to or used in the concrete construction industry of which he has technical knowledge.

(License Agreement 1–2, 4) (emphasis added). Dayton assumed BCS' trade liabilities, but did not assume liability for future tort liability. As a result of these transactions Dayton received all the blending formulas it wanted (Schimpf Dep. at 56). According to the contract, the closing occurred on March 14, 1975, in Dayton, Ohio.

*Dayton's Summary Judgment Motion*

Dayton's motion for summary judgment is based on the traditional rule of nonliability of successor corporations. The tradition-

---

1. The complete names of these companies were Construction & Maintenance Products, Inc., a Florida corporation, and Construction & Maintenance Products, Inc., an Illinois corporation.

2. The Florida operations were moved to Oregon, Illinois, in 1978 or 1979 (Schimpf Dep. at 33).

3. The Bill of Sale was similar to the Purchase Agreement:

> BCS CHEMICAL, INC., . . . ("Grantor"), for $10 and other good and valuable consideration paid to it by DAYTON SURE–GRIP & SHORE COMPANY, ("Grantee"), . . . does hereby sell, grant, convey, assign and set over to Grantee all of Grantor's assets of

every kind and nature, whether tangible or intangible, whether real, personal, or mixed, wherever the same may be located, and including without limitation all machinery, equipment, trade fixtures, tools, appliances, repair parts, furniture and furnishings, vehicles, materials, supplies, inventories of raw materials, work in process and finished products, all licenses, contract rights, claims and causes of action, trademarks, tradenames, all of its cash, accounts receivable, notes receivable, and its business name and goodwill; EXCEPTING, however, Grantor's blending formulas and other trade secrets and its corporate books, records and seal.

al rule is that when one company transfers some or all of its assets to another company the successor is not liable for the debts of the predecessor except when:

"(1) The purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.... A fifth exception, sometimes incorporated ..., is the absence of adequate consideration for the sale or transfer."

1 L. Frumer & M. Friedman, Products Liability § 5.06[2], at 70.58(2)–(3) (1981) [hereinafter cited as Frumer & Friedman] (quoting *McKee v. Harris Seybold Co.*, 109 N.J. Super. 555, 264 A.2d 98 (1970)).

Plaintiff does not urge that Dayton expressly or impliedly agreed to assume BCS' tort liabilities. Neither does he contend that the transaction was entered into fraudulently or lacked adequate consideration. Under the traditional rule, plaintiff concedes, an exchange of stock must occur for a court to find consolidation or merger. The thrust of plaintiff's argument in opposition to defendant's motion for summary judgment is that the Court should find that Dayton was a mere continuation of BCS, *see Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), or that Dayton should be held liable because it continued to manufacture the same product line as BCS, *see Ray v. Alad Corp.*, 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977).

Dayton asserts that this Court is governed by the Sixth Circuit's decision in *Poole v. Amstead [sic] Industries, Inc.*, 575 F.2d 1338 No. 76–2652 (6th Cir. May 22, 1978), *aff'g* No. 1–76–75 (E.D.Tenn. Oct. 5, 1976). The district court in *Poole* viewed the case as calling for an interpretation of the sales contract under the first of the traditional rules quoted above. The court apparently relied on Indiana substantive law. *Id.* at 2. In a per

curiam affirmance the Sixth Circuit emphasized the paucity of allegations in the complaint and the absence of a response by plaintiff to defendant's summary judgment motion. The court noted that the "complaint did not allege that the selling corporation had been dissolved or had gone out of business, or that it was without assets." In the instant case plaintiff alleges and defendant admits that the selling corporation is dissolved, is no longer in business, and has virtually no assets. On this basis alone *Poole* is distinguishable from the instant case.

### Choice of Law

In a diversity case a federal district court is bound to apply the conflict of laws rules of the forum state. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 85 L.Ed. 1477, 61 S.Ct. 1020 (1941). The transferor company was an Illinois corporation; the transferee company was an Ohio corporation; and the injury occurred in Tennessee. Because Tennessee follows basically a lex loci approach, the issue of characterization becomes very important. If this case is characterized as a tort case, the substantive law of Tennessee, the state in which the tort occurred, would govern. *Winters v. Maxey*, 481 S.W.2d 755 (Tenn.1972). Even if the case is characterized as one of strict liability, the lex loci rule would still apply. *Babcock v. Maple Leaf, Inc.*, 424 F.Supp. 428 (E.D.Tenn.1976). If this case is characterized as a contract question under Tennessee law, the rights of parties to a contract are governed by the law that the parties intended, and absent manifestation of contrary intent, the parties are presumed to have contracted under the laws of the state in which the contract was entered into. *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977); *Ohio Casualty Ins. Co. v. Travelers Indemnity Co.*, 493 S.W.2d 465 (Tenn.1973).

Because the basic question in this case is what is the legal effect of the sale of virtually all of the assets of one corporation to another corporation, under Tennessee conflicts rules the substantive law of Ohio applies. Although characterizing the case

as contractual for the purpose of this issue and tortious for purposes of determining liability may seem disjointed, *see Korzetz v. Amsted Industries, Inc.*, 472 F.Supp. 136, 138–42 (E.D.Mich.1979), it is the correct approach. One of the purposes of using choice-of-law rules is to ensure the uniform application of substantive law. The rights of a corporation that contracts in Ohio to purchase the assets of another corporation should be the same with respect to assumption of liability for personal injuries regardless of where the personal injury occurs. For example, if the parties had specifically agreed that Dayton would assume liability for all injuries arising out of the use of BCS' products no one would dispute the characterization of the issue presently before the Court as contractual. The characterization should be no different simply because the parties did not expressly address the issue in their agreement. Under Tennessee's contract choice-of-law rule, this Court must look to the substantive law of Ohio to determine the merits of Dayton's motion.[4]

### Ohio Law

In *Pfisterer v. Toledo, B. G. & S. Traction Co.*, 89 Ohio St. 172, 106 N.E. 18 (1913), the Ohio Supreme Court held that only upon proof of the transferor company's actual intent to defraud its creditors could personal injury plaintiff recover against successor company. In a later decision, however, the Ohio Supreme Court noted that it would look through form to substance in determining whether a successor corporation is a mere continuation and therefore amenable to a suit against the predecessor for personal injury. *Auglaize Box Board Co. v. Hinton*, 100 Ohio St. 505, 126 N.E. 881 (1919). Two Ohio appellate court decisions have used the *Auglaize* look-through-form-to-substance rule to protect the rights of third parties. *Colliery Co. v. Old Ben Coal Co.*, 38 Ohio App. 151, 175 N.E. 755 (1930); *Knight v. Burns*, 22 Ohio App. 482, 154 N.E. 345

(1926). In a case involving the liability of a parent for the taxes and rent of a subsidiary, the three dissenters suggested that the court should look through form to substance to find the parent liable. *North v. Higbee Co.*, 131 Ohio St. 507, 3 N.E.2d 391 (1936).

Because of the willingness of the Ohio courts to look through form to substance and because *Pfisterer* was decided over 66 years ago, this Court must conclude that the Ohio courts would at least examine recent developments in the law of successor liability in products liability actions. The recent trend in successor liability law has been to extend liability to the successor in products liability cases. In *Ray v. Alad Corp.*, 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977), the California Supreme Court held that a transferee that continues to manufacture the same product line as the transferor is subject to strict liability for defective products sold out of that product line by the transferor. Liability was extended to the transferee in *Ray* because: (1) plaintiff faced insuperable obstacles in attempting to obtain satisfaction from the transferee; (2) when the sale of assets occurred, the transferee could gauge the risks of injury from the previously manufactured items and could better spread that risk; and (3) the transferee obtained the benefit of the transferor's goodwill, holding itself out as the transferor.

The *Ray* court departed completely from traditional corporate law in determining successor liability. Because the policy in products liability cases is to spread among society the risk of loss from defective products, the traditional corporate law rule was irrelevant. Moreover, the *Ray* court adopted the three new rules set out above instead of extending the traditional corporate law rule because the new rules more adequately reflected social policy in products liability cases.

In *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), the

---

4. No Tennessee law addresses the liability of successor corporations for the tort liabilities of the predecessor. Defendants assert that *Poole v. Amsted, Inc., supra*, resolves Tennessee law.

In *Poole*, no reference is made to Tennessee law, however, and the only reference to the substantive law of any state is to the law of Indiana.

Michigan Supreme Court held that when a continuity of enterprise exists between the transferee and the transferor corporations, the transferee will be liable for the personal injuries that are caused by the products of the transferor. In arriving at its decision, the *Turner* court noted that the general rule of nonliability "developed not in response to products liability problems, but largely in the areas of creditors' protection ... and of tax assessments ... or, in the case of de facto merger, in the context of shareholders rights." 244 N.W.2d at 878 (citations omitted). The court appropriately recognized that the basic problem in successor cases is that the plaintiff can only seek relief from the second corporation. For the injured person "distinctions between types of corporate transfers are wholly unmeaningful." *Id.* The court held that a continuation of enterprise would be found and liability would attach to the successor when (1) "'there is a continuity of management, personnel, physical location, assets, and general business operations;'" (2) "'[t]he seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible[; and (3) t]he purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.'" *Id.* at 879 (quoting *Shannon v. Samuel Langston Co.*, 379 F.Supp. 797, 801 (W.D. Mich.1974).

The *Turner* and *Ray* cases have been favorably received in the courts and commentaries. *See Andrews v. John E. Smith's Sons Co.*, 369 So.2d 781 (Ala.1979); *Bernard v. Kee Manufacturing Co.*, 394 So.2d 552 (Fla.App.1981); Frumer & Friedman, *supra*, § 5.06[4], at 70.58(19) (1981); 44 Tenn.L. Rev. 905, 914–15 (1977); 30 Vand.L.Rev. 238, 249–251 (1977). *But see Donahue v. Perkins & Will Architects*, 90 Ill.App.3d 349, 45 Ill.Dec. 696, 413 N.E.2d 29 (1980); *Woody v. Combustion Engineering, Inc.*, 463 F.Supp. 817 (E.D.Tenn.1978) (rejecting extension of successor liability rule in products liability cases). The product-line theory of *Ray* is the preferred approach among the commentators. *See* Frumer & Friedman, *supra*, at (19)–(20); 30 Vand.L.Rev., *supra*, at 257 (*Ray* is preferred by these commentators because it reflects products liability policy).

The Ohio courts have recognized the strict liability policy of spreading the risk of loss to all consumers of a product so that the product will bear the social and individual costs of its own defects. *See Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977) (Celebrezze, J.); *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.2d 227, 218 N.E.2d 185 (1966). In order to give effect to that policy, the Ohio courts would look through form to substance and attach liability to a successor corporation that continued the business operation or enterprise of the predecessor if the predecessor was rendered effectively liquidated by the sale of assets. This Court will apply the *Turner* test in this case because it is less of a departure from the traditional rule than the *Ray* test.

Reading the facts in the light most favorable to the nonmovant, this Court finds that:

(1) A basic continuity of the enterprise of BCS and the new chemical division of Dayton Sure-Grip & Shore exists. Employed in the same or similar capacity are the three top officials of BCS—William Falls, Lawrence Falls, and Jim Comiskey. All of the assets of BCS came under Dayton's control. All of the assets of BCS were sold to Dayton pursuant to the purchase agreement except some blending formulas, trade secrets, and the corporate books. Dayton was granted, however, an exclusive license to use or sell all of the blending formulas in Falls repertoire, and Falls expressly warranted that he had licensed or sold to Dayton all of his blending formulas.

(2) BCS ceased ordinary business operations, liquidated, and dissolved soon after the sale of assets occurred. The sale of assets occurred in 1975, and the corporation dissolved in 1976. No evidence indicates that BCS did any business whatsoever after the sale of assets in 1975. No formal disso-

lution occurred. According to William Falls, BCS "just died" (Falls Dep. at 7).

(3) Dayton's assumption of those liabilities and obligations of BCS ordinarily necessary for the continuation of normal business operations is obvious from the purchase agreement.

(4) Although the record is not clear on whether Dayton held itself out as the effective continuation of BCS, many of BCS' former clients were retained by Dayton. This retention indicates that at least to some degree the goodwill of BCS was advantageous to Dayton.

Dayton asserts that even if the *Ray* test is applied liability may not attach because Dayton has never exploited the goodwill, tradenames, or customer lists of BCS. Notably this requirement of exploitation is not part of the *Turner* test, which has been adopted by this Court. On the issue of goodwill, however, Dayton's argument does not withstand summary judgment scrutiny. The Purchase Agreement specifically states that Dayton purchased the goodwill and tradenames of BCS. Moreover, the benefit gained by Dayton from the purchase of virtually all the assets of BCS is the continuation of the operation of the same enterprise. Dayton must have made a measured business choice to purchase the BCS assets instead of starting from scratch. In exercising that judgment Dayton could have taken precautions to protect itself against the liabilities arising from the purchase by obtaining liability insurance.

In *Woody v. Combustion Engineering, Inc.,* 463 F.Supp. 817 (E.D.Tenn.1978) (Pennsylvania law), the court refused to extend liability to successor corporations under *Turner* or *Ray* because the burden on business transfers would be too great. "Holding such a successor corporation liable . . . turns ordinary business transactions into traps for unwary successor corporations." *Id.* at 821. Plaintiff in the instant case was unwary of the transaction between BCS and Dayton. Under the rule of expanding liability, responsibility for the injuries that result from the products of the transferor is placed on the transferee, who

may insure the risk. If BCS made safe products and adequately labeled its products, Dayton's insurance premiums should have been low. On the other hand, if upon investigation to determine reasonable insurance rates Dayton discovered that BCS was routinely shipping dangerous products, Dayton could have protected itself by purchasing liability insurance at a higher rate. This is one of the costs of doing business. A successor cannot shirk the tort liabilities of its predecessor by merely refusing to include tort liability assumption in the purchase agreement. Neither party to that agreement is interested in whether tort liabilities are assumed. Under *Turner* and *Ray* the public interest in equitable placement of responsibility is best served by shifting responsibility from the unwary plaintiff to the successor because it is better able to bear the burden.

Dayton also argues that strict liability policy as reflected by Restatement of Torts section 402A does not support attaching liability to Dayton because it has never marketed or sold hydropel. Dayton has sold similar construction sealers since the BCS assets were purchased. The question under 402A considerations is simply whether a person who is injured by an allegedly unsafe product may proceed against the business that purchased the enterprise that initially put the unsafe product into the stream of commerce. If hydropel was unsafe, the burden of its placement in commerce must be borne by the seller. Restatement of Torts § 402A, comment c (1965). By taking over the enterprise of the seller, Dayton assumed that burden. Nothing in section 402A denigrates this holding.

In *L & M Construction v. Dayton Sure-Grip & Shore Co.,* 445 F.Supp. 280 (D.Neb. 1978), a federal district court held that Dayton could be held liable only for those liabilities specifically set forth in the purchase agreement. The Court in the instant case, however, holds that under Ohio law even though the purchase agreement expressly limits those assets and liabilities assumed by the successor corporation, the successor

corporation can be found liable. The federal district court in Nebraska applied the traditional test and found that Dayton did not merge or absorb with BCS. Indeed, Dayton did not acquire any stock or ownership interest in BCS. Dayton simply purchased all of BCS' assets. BCS, along with the other Falls' companies, became Dayton's chemical division. The Nebraska decision required a continuation of the business *entity* rather than enterprise or operation. This is the traditional rule. In the instant case, however, application of the traditional rule is not appropriate.

If the proof at trial demonstrates that Dayton does not fall within the *Turner* requirements, Dayton will be dismissed from the case. Summary judgment consideration was appropriate at this juncture and in this depth to resolve the legal issue before the Court. Dayton, understandably, did not want to defend a long lawsuit if the facts showed that it would be dismissed in the end. Now Dayton knows that it must be prepared to try this case.

For the reasons set out above, defendant Dayton's motion for summary judgment is denied.

### Danis' Motion for Summary Judgment

 Danis moves for summary judgment on the basis that although it owns 100 percent of the stock of Dayton, stock ownership alone does not render the shareholder liable for the acts of the corporation. Plaintiff argues that the 100 percent stock ownership and the interrelated boards[5] of Dayton and Danis show that Dayton is under the complete control of Danis. If Danis has complete dominion over Dayton, plaintiff argues, Danis can be held liable in tort. Plaintiff's factual allegations are insufficient for this Court to hold Danis liable under any identity of interest, agency, or fiduciary theory.

> [A] corporation is ordinarily an entity, separate and apart from its stockholders, and mere ownership of stock of one corporation by another, and the identity of officers of one with officers of another,

are not alone sufficient to create identity of corporate interest between the two companies or to create the relation of principal and agent or to create a representative or fiduciary relationship between the two.

*Kentucky Electric Power Co. v. Norton Coal Mining Co.*, 93 F.2d 923, 926 (6th Cir. 1938).

For these reasons, Danis' motion for summary judgment is granted.

### Falls' Summary Judgment Motion

 William Falls has moved for summary judgment on the grounds that he cannot be held liable simply because of his ownership of BCS. According to his own deposition, Falls was involved closely with the development and manufacture of chemicals at BCS. The basis for any liability is tied not to his ownership but to his development and manufacturing activities. For these reasons, Falls' motion for summary judgment is denied.

---

5. Four of the seven Dayton directors are officers or employees of Danis.