MICHAEL POLIUS, ROSELYN POLIUS

and

COMMISSIONER OF LABOR OF THE GOVERNMENT OF THE VIRGIN ISLANDS as subrogee of MICHAEL POLIUS, Plaintiffs

v.

CLARK EQUIPMENT COMPANY, Defendant

Civil No. 1984/78

District Court of the Virgin Islands

Div. of St. Croix

May 17, 1985

GORDON C. RHEA, ESQ., and JEFFREY L. RESNICK, ESQ., Christiansted, St. Croix, V.I., *for plaintiffs*

RICHARD H. HUNTER, ESQ., JUDITH A. TURNER, ESQ., Christiansted, St. Croix, V.I., *for defendants*

O'BRIEN, *Judge*

## MEMORANDUM OPINION AND ORDER

This product liability case is presently before the Court on cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs' move for partial summary judgment on the issue of defendant's liability as the successor to the corporation that manufactured the allegedly defective product. Defendant moves the court for judgment on the pleadings or, in the alternative, for summary judgment on the same issue. As matters outside the pleadings are presented, the motion will be treated as one for summary judgment. Fed. R. Civ. P. 12(c).

The Court must decide, as a case of first impression, whether plaintiff Michael Polius, injured by an allegedly defective crane manufactured by the Baldwin-Lima-Hamilton Corporation ("BLH"), may recover from Clark Equipment Company ("Clark"), the corporation that purchased substantially all of the assets of the construction equipment division ("CED") of BLH, under a products liability theory. Additionally, defendant Clark moves for summary judgment on plaintiffs' claim that Clark negligently breached its duty to warn plaintiff Polius of the defect.

For the reasons set forth more fully below, we will grant plaintiffs' motion for partial summary judgment on the issue of successor liability. Defendant's motion will be denied on that issue, and granted on the duty to warn issue.

## I. FACTS

On November 29, 1983, Michael Polius was severely injured when his foot was caught in the clutch assembly of the winding drum of a

Model 900-T Lima crane. The crane was being operated by his employer, the General Engineering Corporation ("GEC"), at the Virgin Islands Water and Power Authority plant in St. Thomas. It was designed and manufactured by BLH in 1969 and was sold to a distributor, Hoffman Equipment, Inc. ("Hoffman"), in January 1970. Hoffman, in turn, sold the crane to West Indies Co., Ltd., which sold it to Canton-Michael, which eventually resold it to GEC.

## II. BACKGROUND

BLH was a corporation whose voting shares were wholly owned by Armour and Company ("Armour"), another corporation. Armour, in turn, was owned and controlled by Greyhound Corporation ("Greyhound"), a conglomerate which was in a multitude of businesses. At some point prior to April 1971 Greyhound decided to sell all of BLH's assets, taking the view that the businesses in which BLH was involved did not fit in with the parent company's long range corporate plan. The sale of BLH's assets was to take place in an orderly fashion as soon as possible, after which BLH would be dissolved.

The construction equipment division of BLH was the largest of its seven units, accounting for about 40% of all sales. It was sold on April 30, 1971, to Clark Equipment Company, which was widely engaged in the manufacture and sale of similar equipment. Until the purchase of BLH, however, Clark had not manufactured a crane since 1962.

Recognizing that BLH was to go out of existence as soon as possible, Clark's contract with BLH included Armour thereby assuring BLH's performance. Essentially, the contract provided:

(1) Clark purchased all the assets of BLH's construction equipment division and subsidiaries owned by that division "required to operate the business" of the construction equipment division "in the manner in which they are currently being operated by BLH . . . ." Purchase Agreement, § 1.21.

(2) For $45,656,000, Clark purchased two manufacturing plants, inventory and accounts receivable, customer lists, the name, goodwill, patents and trademarks of BLH. As counsel for plaintiff noted, the employees of that division left the plant one day working for BLH, and returned the next day working for Clark. Purchase Agreement, §§ 1.9, 1.17, 1.18, 3.1; Bill of Sale.

(3) BLH agreed not to compete with Clark in the construction equipment business for five years, and also agreed to change its name within a year. Purchase Agreement, §§ 5.3, 5.4.

(4) Clark assumed such liabilities as trade accounts payable, payrolls, vacation pay, certain taxes and obligations under contracts, agreements and leases, but it specifically did not assume all other liabilities. Purchase Agreement, §§ 3.1(iii); 8.

(5) BLH, jointly and severally with Armour, agreed to indemnify Clark for a variety of claims arising out of conduct of the business prior to the sale. It was specifically provided that "product liability claims shall be deemed to arise out of the conduct of the business of CED." Purchase Agreement, § 5.9.

After Clark took over from BLH, it resumed the manufacture of cranes, but under its own name.[1] It is unclear whether the cranes then manufactured by Clark were in large measure of the same design as those formerly manufactured by BLH.[2] Clark also continued to provide spare parts to owners of cranes made by BLH, largely through sales to distributors such as Hoffman. Clark retained BLH's files on all cranes sold.

There is no evidence that Clark supplied spare parts directly to any owner of the crane involved in the incident which sparked this lawsuit. Clark may have received parts from the same crane for reconstruction and repair. At no time did Clark come to the Virgin Islands to service the crane, however, and there is no evidence that Clark ever inspected or even viewed the crane. There is also no indication that Clark was ever put on notice of any defect in the crane, either through a prior lawsuit or otherwise.

After the sale of CED, BLH quickly sold off its other six remaining divisions, and by 1972 became an inactive corporate shell. It was formally dissolved in June 1976, through action taken in Delaware. Presumably, any cash remaining in the hands of BLH from asset sales passed at the time of dissolution to the control of Armour as owner of all shares of BLH.

After Michael Polius was injured, he filed this action against Clark claiming that as the successor in interest to BLH, Clark is strictly liable on the same theory that BLH would be. Polius also

---

[1] There is evidence that Clark continued to use the name "Lima" in conjunction with its own on the Model 450 and 550 cranes for a time after the transfer of assets. Deposition of Richard L. Palen, at 29–30. (Plaintiffs' Exhibit 2.)

[2] Clark never manufactured the Model 900-T crane. It did, however, produce a similar crane. The 900-TC could use many of the 900-T parts, but had an environmental cab which isolated the operator from the machinery and provided temperature control. There was also a difference in the number of cables used on the boom hoist system. Deposition of Richard L. Palen, at 36–38. (Plaintiffs' Exhibit 2.)

alleges that Clark had a duty to warn him of the alleged design defect in the 900-T crane. Not named as a defendant in this case is the distributor, Hoffman, which bought the crane from BLH and sold it into the Virgin Islands. Both counsel agreed at oral argument that Hoffman is an ongoing, viable business enterprise operating in New Jersey.

After issue was joined by Clark, it tendered the defense of the action to Armour under the indemnity agreement. That tender was accepted, although counsel for Clark stated that the acceptance of the tender is, at this stage of the proceedings, nothing more than an agreement to defend Clark in the lawsuit. It is hard to see how Armour could avoid payment of any award in favor of Polius, however, in view of the fact that this is a products liability case involving a crane manufactured and sold by BLH before Clark entered the picture.

## III. DISCUSSION

■ ■ The general rule of corporate successor liability is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. There are, however, four well-recognized exceptions. The purchasing corporation may be held liable for the debts of the selling corporation: (1) Where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent and intended to escape liability, or (4) where the purchasing corporation is a mere continuation of the selling corporation. See, e.g., Knapp v. North American Rockwell Corp., 506 F.2d 361 (3d Cir. 1974), cert. denied, 421 U.S. 965 (1975); Amader v. Pittsburgh Corning Corp., 546 F.Supp. 1033 (E.D. Pa. 1982); Jacobs v. Lakewood Aircraft Service, Inc., 512 F.Supp. 176 (E.D. Pa. 1981); Fehl v. S.W.C. Corp., 433 F.Supp. 939 (D. Del. 1977); Shannon v. Samuel Langston Co., 379 F.Supp. 797 (W.D. Mich. 1974); see generally 1 L. Frumer & M. Friedman, Products Liability § 5.06[2] (1984) [hereinafter cited as Frumer & Friedman]; 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7122 (rev. perm. ed. 1983) [hereinafter cited as Fletcher's].

Plaintiffs do not argue that the BLH/Clark transaction falls within any one of these exceptions. Rather, they urge the Court to follow the Third Circuit Court of Appeals lead in Knapp, supra, and use a policy-oriented analysis, instead of the "procrustean formalities" of corporate law theories. Id. at 369.

A. *Product Line Theory*

Certain courts availing themselves of the policy-oriented approach have added a fifth exception to the general rule of successor liability known as the product line theory. This theory, first adopted by the Supreme Court of California in Ray v. Alad Corp., 560 P.2d 3 (Cal. 1977), states that where one corporation acquires all or substantially all the manufacturing assets of another corporation, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for defective products of the same product line, even if previously manufactured and distributed by the selling corporation.

In Ray, supra, the court justified this departure from the general rule by considering three factors:

(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,

(2) the successor's ability to assume the manufacturer's risk-spreading ability, and

(3) the fairness of requiring the successor to assume responsibility for defective products, a burden necessarily attached to the original manufacturer's good will, now being enjoyed by the successor in the continued operation of the business.

Id. at 9.

Thus far, only two other states have heeded the California vanguard. In Ramirez v. Amsted Industries, Inc., 431 A.2d 811 (N.J. 1981), the New Jersey Supreme Court adopted the product line theory. The Superior Court of Pennsylvania then followed suit in Dawejko v. Jorgensen Steel Co., 434 A.2d 106 (Pa. Super. Ct. 1981). Other courts considering the product line exception have declined to adopt it for various reasons. See, e.g., Dayton v. Peck, Stow & Wilcox Co., 739 F.2d 690, 694 (1st Cir. 1984) (no basis for applying any other rule than traditional one in Massachusetts absent sign from legislature or state courts); Tucker v. Paxson Machine Co., 645 F.2d 620, 625 (8th Cir. 1981) (under Missouri law no sufficient reason to depart from traditional rule of non-liability); Travis v. Harris Corp., 565 F.2d 443, 448 (7th Cir. 1977) (no basis under laws of Ohio or Indiana to add product line exception); Leannais v. Cincinnati, Inc., 565 F.2d 437, 441 (7th Cir. 1977) (no product line exception in Wisconsin; adoption of such theory is for legislative consideration); Bonee v. L & M Construction Chemicals, 518 F. Supp. 375, 381 (M.D. Tenn. 1981) (product line theory not adopted by court apply-

ing Ohio law because it is a complete departure from traditional corporate law); Bernard v. Kee Mfg. Co., 409 So. 2d 1047, 1049 (Fla. 1982) (adoption of product line theory would threaten economic annihilation of small businesses); Pelc v. Bendix Machine Tool Corp., 314 N.W.2d 614, 620 (Mich. Ct. App. 1981) (invitation declined to adopt more expansive product line theory of liability).

Plaintiffs place an inordinate amount of emphasis on certain district court cases from the Third Circuit deciding the issue of successor liability pursuant to the laws of New Jersey and Pennsylvania. Yet district courts are not bound by decisions of their counterparts in other districts, even those districts within the same circuit. 1B J. Moore, Moore's Federal Practice ¶ 0.402[1] at 16 & n.21 (1984). Furthermore, the courts applying Delaware law, another state within the Third Circuit, have been reluctant to expand traditional corporate theories. See, e.g., Fehl v. S.W.C. Corp. 433 F. Supp. 939 (D. Del. 1977).

■ This Court does not agree with plaintiffs' assertion that the product line theory is the emerging rule of law or the modern trend.[3] Rather, we view it as a narrow exception explicitly adopted only by the states of California, New Jersey and Pennsylvania. We, therefore, decline to accept it as the law of the Virgin Islands.

B. *Continuity of Enterprise*

With the product line theory the courts developed a new exception to the general rule of successor liability. The continuity of enterprise theory, however, has been heralded as a less radical departure from traditional corporate rules, as it expands upon the existing mere continuation exception instead of creating a new one. See Bernard, supra; Pelc, supra; Fletcher's § 7123.5 (Cum. Supp. 1984).

■ The original mere continuation exception requires a common identity of officers, directors, and shareholders in the selling and purchasing corporations, and the existence of only one corporation at the completion of the transfer. See, e.g., Tucker v. Paxson Machine Co., 645 F.2d 620, 625–26 (8th Cir. 1981); Travis v. Harris Corp., 565 F.2d 443, 447 (7th Cir. 1977); Leannais v. Cincinnati, Inc., 565 F.2d 437, 440 (7th Cir. 1977); Savini v. Kent Machine Works,

---

[3] Plaintiffs have treated the product line theory, the continuity of enterprise rule, and de facto merger as interchangeable theories. Assimilating all three, plaintiffs state that there can be no doubt that the product line is the modern trend. We, however, are very careful to distinguish the product line from the continuity of enterprise theory.

Inc., 525 F. Supp. 711, 717 (E.D. Pa. 1981); Jacobs v. Lakewood Aircraft Service, Inc., 512 F. Supp. 176, 181 (E.D. Pa. 1981); Frumer & Friedman, § 5.06[2][c].

As first enunciated in Cyr v. B. Offen & Co., 501 F.2d 1145 (1st Cir. 1974), the requirement of substantial identity of ownership was deleted from the continuity doctrine. In Turner v. Bituminous Casualty Co., 244 N.W.2d 873 (Mich. 1976), the court further expanded the continuity exception refusing to distinguish between a purchase of assets for stock and purchase of assets for cash. Eventually, the requirement that the selling corporation dissolve immediately after the transaction was moderated in Korzetz v. Amsted Industries, Inc., 472 F. Supp. 136 (E.D. Mich. 1979). For other cases adopting the continuity of enterprise theory see Bonee, supra; Rivers v. Stihl, Inc., 434 So. 2d 766 (Ala. 1983); Andrews v. John E. Smith's Sons Co., 369 So. 2d 781 (Ala. 1979).

■ The guidelines used in determining whether products liability may attach to a purchasing corporation on the theory of continuing enterprise are:

(1) continuity of management, personnel, physical location, assets and general business operations of the selling corporation; and

(2) selling corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;

(3) purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations to the selling corporations, and

(4) purchasing corporation holds itself out to the world as the effective continuation of the seller corporation.

Korzetz, supra, at 143; Pelc, supra, at 618; Turner, supra, at 883–84; Frumer & Friedman, § 5.06[3] at 70.58(17)–(18); Fletcher's § 7123.5 (Cum. Supp. 1984). It is not necessary that all factors be present, so long as the totality of the transaction demonstrates a basic continuity of the enterprise. Id.; Korzetz, supra, at 143–44 (sliding scale analysis).

Applying these guidelines to the facts of this case, a strong argument can be made that Clark is indeed a continuation of the BLH construction equipment division. Pursuant to the Purchase Agreement, Clark bought two manufacturing plants and all of the assets

necessary to continue the BLH business.[4] BLH's employees were retained by Clark.

Although BLH did not officially dissolve pursuant to the law of Delaware until June 1976, it did cease conducting business after the transfer to Clark. BLH's parent company, Armour, was then in the process of disposing of the different BLH divisions and carried CED on its books as inactive. For all intents and purposes, the BLH construction equipment division ceased to do business after the sale of assets.[5]

Clark assumed CED's liabilities for trade accounts payable, payrolls, and vacation pay as of the closing date. Clark also assumed certain taxes and obligations under CED's contracts, agreements, leases, and undertakings. Thus, all the liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations were assumed by Clark.

We concede Clark did not hold itself out to the world as the effective continuation of BLH as did the new owners in Cyr v. B. Offen & Co., 501 F.2d 1145 (1st Cir. 1974).[6] It did, however, require BLH to change its corporate name to a name not including "Lima", "AW", "Austin", "Western", or "Madsen". The right to use these names was transferred to Clark. Clark appears to have obtained the right to the names as a device to eliminate them from competing with its own products. Further, BLH was prohibited from competing with Clark for five years.

By accepting the continuity of enterprise theory, until now adopted by a minority of jurisdictions, and applying it to the facts of this case, we are following the directive of the Third Circuit Court of Appeals in Knapp, supra, and must weigh the policy considerations. The public policy underlying strict products liability is to protect

---

[4] The fact that Clark purchased only one of BLH's divisions does not prevent it from qualifying as a successor corporation as defendant urges. In Trimper v. Bruno-Sherman Corp., 436 F. Supp. 349 (E.D. Mich. 1977), the selling corporation continued to operate in other fields after the transfer. This did not prevent the court from finding that the purchasing corporation was a continuation of the seller. Id. at 350.

[5] In Knapp v. North American Rockwell Corp., 506 F.2d 361 (3d Cir. 1974), the Court carefully analyzed the continued existence of the selling corporation by looking at the brevity of its continued life, the contractual requirement that it be dissolved as soon as possible, the prohibition of engaging in normal business transactions, and the character of the assets the selling corporation controlled. Id. at 367.

[6] In Cyr, B. Offen & Co., Inc. advertised itself as an ongoing enterprise, and claimed that it was a 40-year-old business. Id. at 1151.

the injured party by placing the burden on the party most able to bear the loss by spreading the risk. Restatement (Second) Torts § 402A comment c (1965). By reaping the benefits of the predecessor corporation, it is acknowledged that the successor should bear some of the burdens of continuity. Clark prepared itself for this eventuality. Besides including a non-assumption of liabilities clause in the purchase agreement, Clark protected itself with an indemnification clause. Armour and BLH, jointly and severally, agreed to indemnify and hold Clark harmless against all causes of action arising out of CED's conduct, including product liability claims. Clark has tendered the defense of this case to Armour, which has accepted it.

We cannot deny the importance to our decision of the fact that Clark is cloaked with the protection of the indemnification agreement with Armour. If Clark is kept as a defendant in this case, in all probability it will be Armour which will bear the risk of loss. Armour owned BLH and caused its dissolution. Armour is the entity to whom the risk of loss should be shifted under a public policy argument in the context of this case.

It is only through Clark that Armour can be caused to bear the risk of loss. If the plaintiffs should add Hoffman as a defendant, this distributor corporation would logically have a third party action against the manufacturer, BLH. But Hoffman would not, as we understand the law, be able to pursue Armour in the face of BLH's dissolution. It is only Clark which has that right, and such right exists only by contract.

We recognize, too, the contradiction brought on by our refusal to accept the product line exception because it is a minority view, while at the same time we adopt an expansion of the mere continuity exception. But we view our actions as a less radical departure from the general rule, dictated by the specific facts of this case.

C. *Duty to Warn*

■ Finally, as an independent cause of action, plaintiffs allege that Clark knew or should have known about the defective condition of the 900-T crane and negligently failed to warn Michael Polius. A successor corporation can be held independently liable for failure to warn of pre-existing defects, only where they come to its attention. The mere fact of succession does not impose such a duty. See Tucker v. Paxson Machine Co., 645 F.2d 620, 626 (8th Cir. 1981); Gee v. Tenneco, Inc., 615 F.2d 857, 866 (9th Cir. 1980); Travis v. Harris Corp., 565 F.2d 443, 448 (7th Cir. 1977); Jacobs v. Lakewood Aircraft Service, Inc., 512 F. Supp. 176, 185 (E.D. Pa. 1981); Frumer & Friedman § 5.06[5].

In deciding whether the successor corporation had a duty to warn, courts have looked to the continuity of the relationship between the successor and the customers of the predecessor. In Travis, supra, the court considered 1) succession to a predecessor's service contracts; 2) coverage of the particular product by a service contract; 3) actual service of the product by the successor; 4) the successor's knowledge of defects, and 5) the successor's knowledge of the location or owner of the product. Id. at 449.

Clark claims that it did not acquire BLH's service contracts when it purchased the CED assets on April 30, 1971. Nor did it service the 900-T crane involved in the accident. All replacement parts were ordered through the original purchaser and distributor, Hoffman. Further, Clark denies having any independent knowledge of defects in the particular crane, or in the line of Model 900-T cranes. Clark states that it did not even know the crane was located in the Virgin Islands. After it was sold to Hoffman it changed hands three times; it was bought first by West Indies Company, then Canton-Michael, Inc., and ultimately by the General Engineering Corporation.

Although plaintiffs do not claim that Clark succeeded to BLH's service contracts, they maintain that Clark's continued contact with BLH's customers gives rise to a duty to warn them of defects. Indicative of this relationship is Clark's purchase of customer lists, accounts receivable, and a filing system identifying each BLH crane, including the one giving rise to this action. Additionally, plaintiffs claim that Clark had ample opportunity to become knowledgeable of the defect. Clark purchased the plans, schematics, and designs of the 900-T crane. It sold the remaining three it had purchased as part of BLH's assets, modified the design, and marketed the new Model 900-TC crane. Plaintiffs urge the Court to deny Clark's motion for summary judgment on the duty to warn issue.

It is clear from the record that Clark did not succeed to BLH's service contracts. It follows then that Clark did not have a service contract covering the subject 900-T crane. Nevertheless, plaintiffs would have us believe that Clark serviced the subject crane. As proof thereof they cite a letter dated June 25, 1971, from Clark's Parts Sales Department to the distributor Hoffman, regarding an attempted repair of a part of the subject crane (Plaintiffs' Exhibit 9).

Plaintiffs do not claim that Clark had actual notice of the defect but argue that it was a design defect common to all such cranes, and Clark was therefore in a position to know of the defect and rectify it.

This, however, is not the standard. In order to have a duty to warn Clark must be aware of a design defect.

In the recent case Stratton v. Garvey Int'l., Inc., 676 P.2d 1290 (Kan. Ct. App. 1984), the court carefully studied many duty to warn cases and concluded that the continued relationship between the successor corporation and the predecessor's customers must be more than casual so that any defects would be brought to the successor's attention. Holding otherwise would give rise to a duty to warn whenever a successor had any dealings whatsoever with its predecessor's customers. Id. at 1296 (citing Jacobs, supra).

In Stratton the successor corporation did not assume any service contracts. Although the successor continued to do repair work, it did not work on the subject machine. The successor did not seek out the predecessor's customers but many relied on it for necessary repairs. Finding that there was no solid evidence that the successor had any knowledge of defects, the court affirmed the lower court's finding that there was no duty to warn. Id.

Similarly, in Tucker, supra, the Eighth Circuit Court of Appeals affirmed the district court's finding that there was no basis to impose a duty to warn where the successor did not assume responsibility for servicing the predecessor's machines and there was only a bare assertion that the successor had knowledge of the defective nature of the machines. Id. at 626–27.

The Seventh Circuit Court of Appeals affirmed summary judgment in favor of the successor corporation in Travis, supra, where there was no assumption of service contracts or allegation that the successor knew of defects. Plaintiff relied solely on a single service call made by an employee of the successor corporation to the subject machine. This was not sufficient to establish a duty to warn.

Plaintiffs cite Leannais, supra, to demonstrate that Clark's motion for summary judgment should be denied. In Leannais the district court's entry of summary judgment was reversed. The court found that the successor corporation assumed all service obligations, demonstrating an actual or potential economic benefit. It remanded the case as there remained questions of fact regarding whether the particular machine was under a service contract, whether the successor had ever serviced the machine, and whether the successor had information concerning the present ownership of the machine. Id. at 442. After an evidentiary hearing on remand, the district court found that the successor was aware of the existence of the subject machine, had provided replacement parts, and had an ongoing business relationship with the owners of the machine. Leannais v.

Cincinnati, Inc., 480 F. Supp. 286, 290 (E.D. Wis. 1979). See also Schumacher v. Richards Shear Co., 451 N.E.2d 195 (N.Y. 1983).

The factual situation in the present case is distinguishable from that in Leannais. There was no ongoing business relationship between Clark and GEC, Polius' employer. Clark assumed no service contracts. Simply by their broad use of the term service plaintiffs cannot extend the factual situation here to amount to the continuing and on-going relationship necessary to establish a duty to warn. Furthermore, aside from plaintiffs' allegation that Clark had ample opportunity to become knowledgeable of a defect, the record is void of any proof that Clark actually had notice. In a disclosure statement prepared by BLH, there were two listed failures in the 900-T crane neither of which related to the design defect claimed by plaintiffs. (Plaintiffs' Exhibit 5 at 13.)[7] Additionally, the fact that Clark retained BLH's files on each crane does not warrant a finding that Clark knew the whereabouts of the subject crane or who the owner was.

■ We find that Clark did not have a duty to warn Michael Polius of the allegedly dangerous condition of the 900-T crane. Accordingly, summary judgment will be granted for Clark on this alternative theory of liability.

## IV. CONCLUSION

In conclusion, we hold that Clark, as the successor corporation to the construction equipment division of BLH, may be found liable for design defects in its predecessor's products under the continuity of enterprise theory. We stress the narrowness of this ruling based on the factual situation in this case. Plaintiffs' motion for partial summary judgment will be granted.

Clark's motion for summary judgment will be denied in part, and granted on the duty to warn issue.

## JUDGMENT

THIS MATTER came before the Court on cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. The Court hav-

---

[7] Moreover, in Chadwick v. Air Reduction Co., 239 F. Supp. 247 (N.D. Ohio 1965), the court found that even if the successor corporation had knowledge of claims against the predecessor for design defects it had no duty to warn absent an assumption of liability or a special relationship between the successor and plaintiff. Id. at 249–250.

ing filed its Memorandum Opinion of even date herewith, and the premises considered, now therefore it is

ORDERED, ADJUDGED AND DECREED:

THAT plaintiffs' motion for partial summary judgment be and the same is hereby GRANTED; and

THAT defendant's motion for summary judgment be and the same is hereby DENIED on the issue of successor liability and GRANTED on the issue of duty to warn.