Michael POLIUS, Roselyn Polius, and Commissioner of Labor of the Government of the Government of the Virgin Islands, as subrogee of Michael Polius, Appellants in 85-3392,

v.

CLARK EQUIPMENT COMPANY, Appellant in 85-3393.

Nos. 85-3392, 85-3393.

United States Court of Appeals, Third Circuit.

Argued April 28, 1986.

Decided Sept. 29, 1986.

Rehearing and Rehearing En Banc Denied Oct. 23, 1986.

Gordon C. Rhea (argued), Thomas Alkon, Jeffrey L. Resnick, James & Resnick, Christiansted, St. Croix, V.I., for Michael Polius, et al.

Richard H. Hunter (argued), Judith A. Turner, Isherwood, Hunter, & Colianni, Christiansted, St. Croix, V.I., for Clark Equipment Co.

Before HUNTER, WEIS, and MANS-MANN, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal we examine a claim caught up in the swirling cross currents of products liability and corporate successor responsibility. Plaintiff was injured while using an allegedly defective product manufactured by a now defunct corporation that had sold a substantial part of its assets to defendant. Reasoning that in practical effect defendant had carried on the business of the original manufacturer and therefore should assume its liabilities, the district court refused to dismiss the case. We conclude that this continuity of enterprise theory, adopted by a minority of jurisdictions, is an unsound exception to the general rule of corporate successor liability. We also determine that defendant did not owe a duty to warn under the circumstances here. Accordingly, in conformance with the answers to controlling questions of law as framed by the district court under 28 U.S.C. § 1292(b), we will direct an entry of judgment for defendant.

In response to motions submitted to it, the district court entered partial summary judgment in favor of plaintiff Michael Polius, holding that defendant Clark Equipment Company could be found liable as a successor to the Baldwin-Lima-Hamilton

Corporation.[1] The court also entered partial summary judgment in favor of defendant, concluding that it had no duty to warn under the circumstances.

The plaintiff's injury occurred in November 1983, when his foot caught in the clutch assembly of the winding drum of a crane. The machine had been designed and manufactured in 1969 by Baldwin-Lima-Hamilton (Baldwin) and sold to a distributor, Hoffman Equipment Company, in 1970. The plaintiff's employer, General Engineering Company, was the third user of the crane, two other construction companies having previously owned and operated it.

At the time it initially manufactured and sold the crane to the distributor, Baldwin was a large corporation functioning through seven divisions. All of its stock was owned by Armour and Company, which in turn was wholly owned by Greyhound Corporation.

In 1971, as a matter of corporate development, Greyhound decided to sell Baldwin's assets. In April of that year, defendant Clark Equipment Company purchased the construction equipment division for $45,656,000 cash.[2] The agreement provided that Clark would receive all of the assets of Baldwin "required to operate the business" of the division "in the manner in which [it] is currently being operated." The sale included two manufacturing facilities, inventory, accounts receivable, customer lists, and good will as well as trade names, patents, and trademarks of Baldwin.

Clark assumed liability for the Baldwin division's trade accounts, payroll, vacation pay, and some taxes and selected contractual obligations. The sales agreement did not transfer Baldwin's service contracts. Clark expressly refused to assume any tort liabilities, and Baldwin and Armour agreed to indemnify Clark for all claims arising from the division's operations.

No sale or exchange of stock took place, nor did officers or directors of Baldwin become officers or directors of Clark. The agreement did not mandate dissolution, but Baldwin was required to use its best efforts to keep the division's employees available for Clark.

By 1972, when it changed its name to "BLH, Inc.," Baldwin had sold the six remaining divisions and had become an inactive corporate shell. Formal dissolution occurred in 1976, some seven years before the plaintiff's injury.

After the purchase, Clark manufactured several large cranes, apparently using its own name, and at least for a time, Baldwin's as well. Clark provided replacement parts to its distributors but did not sell directly to crane owners, nor did it service the machines except through distributors. The purchase proved an unhappy one for Clark, and after suffering substantial losses, it ceased manufacturing cranes in 1981.

In February 1984, a year after he was injured by the Baldwin crane, plaintiff filed suit against Clark, alleging strict liability and failure to warn.[3] Clark tendered the defense to Armour, which accepted it and provided representation.

Both parties moved for summary judgment. The district court carefully reviewed the various theories of corporate successor liability and, being "uncomfortable" with the "product line" approach, rejected the cases which espoused it. The district court concluded, however, that the "continuity of enterprise" rule was applicable because Clark had assumed the liabilities and obligations "ordinarily necessary for the uninterrupted continuation of normal business operations." 608 F.Supp.

1. The district court's opinion is reported at 608 F.Supp. 1541 (D.V.I.1985).

2. The other six divisions of Baldwin were the Electronics Division in Waltham, Massachusetts; the Industrial Equipment Division in Eddystone, Pennsylvania; the Standard Steelworks Division in Burnham, Pennsylvania; the Green Fuel Division in Beacon, New York; the Allen-Sherman-Hoff Company in Wynwood, Pennsylvania; and the Trans-International Corporation in West Germany.

3. Plaintiff later filed a separate suit against Hoffman, the distributor. That litigation is still pending in the district court.

1541, 1546 (D.V.I.1985). Moreover, "[b]y reaping the benefits of the predecessor corporation ... the successor should bear some of the burdens of continuity." *Id.* Added to these considerations was "[t]he public policy underlying strict products liability [which] is to protect the injured party by placing the burden on the party most able to bear the loss by spreading the risk." *Id.*

Because it believed that "Armour [was] the entity to whom the risk of loss should be shifted under a public policy argument in the context of this case," the district court emphasized the importance of the indemnification agreement with Armour, which had owned Baldwin and caused its dissolution. *Id.* Based on this line of reasoning, the district court concluded that Clark could be liable for the torts of Baldwin.

The summary judgment motions also included the defendant's contention that it could not be liable under the failure to warn theory. The district court agreed with defendant, noting that Clark neither assumed Baldwin's service contracts nor had any other contract with the plaintiff's employer. Furthermore, the record did not show that Clark had actual notice of a defect. Accordingly, on this issue, the court granted partial summary judgment for defendant.

On the parties' motions, the district court formulated the following controlling questions of law for an interlocutory appeal of its order pursuant to 28 U.S.C. § 1292(b):

"1. Did the district court properly grant plaintiff's motion for partial summary judgment where it held that plaintiff Michael Polius, injured by an allegedly defective crane manufactured by Baldwin-Lima-Hamilton Corporation ("BLH"), may recover from defendant Clark Equipment Company, the corporation that purchased substantially all of the assets of the construction equipment division of BLH, under the continuity of enterprise exception to the

general rule of corporate successor liability?

"2. Did the district court properly grant Clark's motion for partial summary judgment where it held that Clark did not have a duty to warn plaintiff Michael Polius of the allegedly defective condition of the crane that caused the injury?"

On appeal the parties agree that the law of the Virgin Islands should apply to the case at hand, and we accept that choice of law. Where the Virgin Islands has no governing statute, as here, 1 V.I.C. § 4 directs us to examine the common law, first as expressed in the Restatements, and then as generally understood and applied in the United States. Where the Restatement is silent and a split of authority exists, courts should select the sounder rule. *Wells v. Rockefeller*, 728 F.2d 209 (3d Cir.1984).

Describing the characteristics of the corporate body, Blackstone wrote that "all the individual members that have existed from the foundation to the present time, or that shall ever hereafter exist, are but one person in law, a person that never dies; in like manner as the river Thames is still the same river, though the parts which compose it are changing every instant." 1 W. Blackstone, Commentaries *467–469. A corporation whose stock is actively traded on an exchange has a constantly changing ownership; however, that fluctuation does not affect the corporation's liability for its past actions.

The same concepts of continuing life and accountability underlie the law governing corporate merger through the purchase of stock. Liability continues because the corporate body itself survives. A different rule applies when one corporation purchases the assets of another. Under the well-settled rule of corporate law, where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor. 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* § 7122 (Perm.Ed.1983).

Four generally recognized exceptions qualify this principle of successor nonliability. The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company. *See Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308–09 (3d Cir.1985); *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 363–64 (3d Cir.1974). *See generally,* Note, *Products Liability-Successor Corporations*, 33 Kan.L.Rev. 791, 792–97 (1985).

The successor rule was designed for the corporate contractual world where it functions well. It protects creditors and dissenting shareholders, and facilitates determination of tax responsibilities, while promoting free alienability of business assets. *See* Phillips, *Product Line Continuity and Successor Corporation Liability*, 58 N.Y. U.L.Rev. 906, 909 (1983). The doctrine reflects the general policy that liabilities adhere to and follow the corporate entity. However, when the form of the transfer does not accurately portray substance, the courts will not refrain from deciding that the new organization is simply the older one in another guise. In that instance, the continuation approach articulated by Blackstone remains applicable. Note, *Postdissolution Product Claims and the Emerging Role of Successor Liability*, 64 Va.L.Rev. 861, 866 (1978).

Application of traditional corporate doctrine to tort actions, however, has caused some dissatisfaction. Advocates of change have proposed variations that seek a responsible defendant to satisfy the claims of persons injured by corporate products. *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir.1974).

The New Jersey Supreme Court observed that traditional corporate law limits the number of those subject to liability "and places unwarranted emphasis on the form rather than the practical effect of a particular corporate transaction." *Ramirez v. Amsted Industries, Inc.*, 86 N.J.

332, 341–42, 431 A.2d 811, 816 (1981). From the perspective of the injured plaintiff, the Michigan Supreme Court commented, "distinctions between types of corporate transfers are wholly unmeaningful." *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 419, 244 N.W.2d 873, 878 (1976).

These observations were strongly influenced by the social and economic views espoused by the Restatement (Second) of Torts § 402A and the California courts. The supreme court of that state, unhappy with the traditional rule of corporate successor liability, concluded that " 'the paramount policy to be promoted by [strict liability] is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them.' " *Ray v. Alad Corp.*, 19 Cal.3d 22, 31, 136 Cal.Rptr. 574, 579, 560 P.2d 3, 8 (1977), quoting *Price v. Shell Oil Co.*, 2 Cal.3d 245, 251, 85 Cal.Rptr. 178, 181, 466 P.2d 722, 725 (1970). The court justified extension of liability to a successor corporation not otherwise responsible because of (1) the virtual destruction of the plaintiff's remedies against the original manufacturer through its acquisition by the successor; (2) the successor's ability to assume the original manufacturer's risk spreading role; and (3) the fairness of requiring the successor to assume responsibility for defective products that had been the original manufacturer's burden and therefore part of the good will the successor continued to employ in the operation of the business. *Id.*, 19 Cal.3d at 33–34, 136 Cal.Rptr. at 580, 560 P.2d at 9.

Following this approach, a successor that continues to manufacture the same type of article as its predecessor becomes liable "for defects in units of the same product line previously manufactured" by the predecessor. 19 Cal.3d at 34, 136 Cal.Rptr. at 582, 560 P.2d at 11. This "product line" exception imposes liability where traditional corporate law does not. *See* Note, *Products Liability of Successor Corporations: A Policy Analysis*, 58 Ind.L.J. 677, 678–82 (1983); Note, 64 Va.L.Rev. at 876–78.

Another alternative emerged from *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), where the Michigan Supreme Court expanded the traditional exceptions to increase a successor's exposure in products liability cases. The court reasoned that whether the corporate transaction was an acquisition of assets for cash, or a traditional form of merger, was irrelevant from the standpoint of the injured party.

Applying that rationale, the court found a "continuity of enterprise" where the successor had retained key personnel, assets, and general business operations as well as the company name, and had assumed liabilities and obligations of the seller ordinarily necessary for normal business operations. Furthermore, in *Turner* the successor held itself out to the world as an effective continuation of the seller, which had ceased operations and dissolved soon after the sale.[4]

The *Turner* dissent argued that the analysis should focus, not on the continuation of the business operation, but on the continuation of the corporate entity. Moreover, the plaintiff was in the same situation as any other claimant with a judgment against a corporation that had simply dissolved, leaving nothing behind.

In this circuit, New Jersey has adopted the product line exception. *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981). The state supreme court found fundamental differences between the "continuity" theory of *Turner* and the product line approach of *Ray v. Alad Corp.* *Turner* merely represented an extension of the traditional rule, while *Alad* abandoned it and looked instead to the successor's manufacture of products of the same nature as that which injured the plaintiff.

The New Jersey court recognized difficulties with the product line approach, but believed they should not "overshadow the basic social policy, now so well-entrenched in our jurisprudence, that favors imposition of the costs of injuries from defective products on the manufacturing enterprise and consuming public rather than on the innocent injured party." 86 N.J. at 354, 431 A.2d at 823.

A panel of the Pennsylvania Superior Court also adopted the product line theory, relying on the need to provide recovery for victims. *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 434 A.2d 106 (1981). The Pennsylvania Supreme Court has not yet passed on the issue.

Similarly, the Delaware Supreme Court has not addressed these minority doctrines. In *Fehl v. S.W.C. Corp.*, 433 F.Supp. 939, 946–47 (D.Del.1977), the district court noted the absence of state cases defining products liability exposure of successor corporations but after a thorough review, concluded that a continuation theory would be applied narrowly by Delaware courts. "[I]t must be the same legal person having a continued existence under a new name." 433 F.Supp. at 947.

In *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir.1974), we predicted that under the circumstances presented, the Pennsylvania Supreme Court would be influenced by the policy consideration of spreading the risk and would find a de facto merger. *Knapp* is essentially a merger case; the seller had received stock in the successor corporation as payment for the assets and was required to dissolve "as soon as practicable" after the sale. 506 F.2d at 363. Moreover, the seller's officers and employees then serving were made available to the purchaser.

4. The court identified the following elements as "guidelines" for establishing the requisite continuity:
(1) basic continuity of the seller's enterprise, through management, personnel, physical location, assets, and general business operations;
(2) dissolution of the seller soon after the sale;
(3) assumption of the seller's liabilities and obligations ordinarily necessary for the uninterrupted continuation of normal business operations; and
(4) holding itself out to the world as the continuation of the seller.
397 Mich. at 430, 244 N.W.2d at 882.

The concurring opinion rested on the premise that the transaction amounted to a merger under state corporate law. *Knapp*, therefore, does not represent a prediction that the Pennsylvania Supreme Court would join the minority of jurisdictions which have adopted either the continuity of enterprise or product line theories of liability.

In *Knapp* we were limited in our role as a diversity court to predicting the appropriate state law. In our role as the Supreme Court of the Virgin Islands, however, when the Restatement does not control, we must apply the law which represents the better approach, be that the minority or majority rule.

Plaintiff adopts the position of the minority jurisdictions and argues that we should jettison well-established corporate law because the claim arises from an allegedly defective product. Satisfaction of this type of claim is so important, the argument goes, that plaintiffs must be given preferred consideration in their efforts to recover damages. Thus, unlike other creditors of the selling corporation, product injury claimants may look, not only to the assets of the corporation primarily liable, but also to other entities which, because they continue making the same products, may be able to spread the costs of the claim to future customers.

At the outset, we note some of the inconsistencies in the arguments supporting the minority view that strict liability concerns should predominate over those of corporate organization.

The rationale of the product line or continuity of enterprise theories rests in large part on a postulated need to compensate plaintiffs eligible under § 402A. A fundamental flaw in the analysis focusing on § 402A victims is that it ignores the fact that plaintiffs injured by simple negligence have always had an equal right to claim priority. The advent of § 402A made it possible for some plaintiffs to win a judgment they could not have obtained if proof of negligence was required. Whatever the merits of that change, it does not logically support expansion of liability against successor corporations merely because the primary tortfeasor is no longer available to pay the judgment. The two concepts are simply ships passing in the night.

Plaintiffs who prevail in their products liability claims encounter the same problems of collection whether their suits are based on negligence or strict liability. The theory of recovery does not affect the ability to collect the judgment. Furthermore, a plaintiff injured by the negligence of a corporation in other than a products case may be as much in need of, and entitled to, compensation as the victim of a defective product.

Nor does the concept of spreading the risk apply exclusively to products liability judgments. The bystander injured by a manufacturer's agent during the negligent installation of a machine will have his recovery spread to the company's customers as a cost of doing business just as surely as will the operator who sustains injury as a result of an inherent defect in the machine after it is in use.

We perceive no principled distinction between victims of corporate negligence and those whose recovery rests on § 402A that would justify departure from the traditional rule of corporate successor liability in strict liability cases.

One real difference, however, may exist where a defective product rather than active negligence on the part of the corporation causes the injury. That distinction lies in the length of time which may elapse between the precipitating act and the plaintiff's injury.

An automobile collision, for example, usually presents no time gap, and the spectre of an intervening corporate dissolution does not generally threaten judgment collection. In products liability cases, however, a lengthy time lag often exists. The facts of a New Jersey case, which the state supreme court overruled when it adopted the product line approach, illustrate that delay. In *McKee v. Harris-Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98 (1970), the

plaintiff was injured in 1968 by an allegedly defective machine manufactured in 1916 by a corporation that had dissolved in 1928. Although not every products case has an interval of fifty-two years between the date of manufacture and injury, the time spans are often long. Indeed, in the case at hand fourteen years elapsed between manufacture and injury.

The time gap presents a significant distinction between product defect cases and other personal injury claims, and may be an unexpressed but significant inducement in the extension of successor liability. The courts adopting the minority doctrines, however, have not attempted to use this hiatus as a justification for their positions. Their failure to discuss this issue may perhaps reflect a reluctance to explore the troublesome question of appropriate statutes of repose in products liability cases, a question within the traditional legislative sphere.

In a broader view, it may be argued that state corporate dissolution requirements should be modified to require adequate provision for compensating creditors whose claims have not yet accrued, but again a solution of that type must necessarily be undertaken by the legislature, not the courts.

The problems are complex, and some of the difficulty stems from § 402A itself. Although theoretically enticing, it has demonstrated significant economic weakness in practice. That a corporation the size of General Motors may be able to spread the cost of § 402A among its millions of customers does not mean that a machine shop employing five or ten individuals has similar capabilities.[5] And General Motors' ability to self-insure if no liability policies are available does not aid the machine shop when its premium for a policy (assuming it can get one) rises to confiscatory heights. The problem of compensating injured individuals for their losses is indeed serious; it extends across a broad spectrum not limited to products liability, and whether the costs of piecemeal measures like § 402A exceed the societal benefits remains questionable.

Even accepting § 402A theory as sound does not support the product line and continuity of enterprise theories. Comment c to that section states that the justification for strict liability "has been said to be that the seller ... has undertaken and assumed a special responsibility" toward the user, that the public has the right to "rely upon the seller, that reputable sellers will stand behind their goods," and that the proper persons to afford protection to consumers "are those who market the products."

Thus the Restatement reaffirms the notion of a causal relationship between the defendant's acts and the plaintiff's injury—a concept that is fundamental to tort law. The corporate successor theories espoused by Michigan and California brush aside this bedrock requirement and impose liability on entities which in fact had no connection with the acts causing injury.[6]

Even the wholesaler or retailer who sells a defective product has some causal connection with the plaintiff's injury. The same cannot be said of the owner of a new business who manufactures an improved, defect-free, version of a product in a facility purchased from his predecessor. Under the product line theory, the new owner would be liable for the sins of his predecessor even though the new product did not, and could not, cause injury.

Under the continuity of enterprise theory, a new owner who continues his predecessor's operations may be liable if he manufactures some but not all of a number of items. If the new owner continues to manufacture ten items but decides not to produce one because it is too dangerous, he might nevertheless be liable for claims

**5.** In *Hamaker v. Kenwel-Jackson Machine, Inc.,* 387 N.W.2d 515 (S.D.1986), the Supreme Court of South Dakota refused to find successor liability on a corporation which started with a work force of only three individuals.

**6.** This consideration has been the subject of scholarly commentaries, *see, e.g.,* Phillips, 58 N.Y.U.L.Rev. at 916–17; Note, 33 Kan.L.Rev. at 796; Note, 58 Ind.L.J. at 697 (1983).

which his predecessor set in motion through the dangerous product. If deterrence serves as a basis for the requirement of causation, these hypotheticals illustrate the incongruity of imposing liability where deterrence would not be furthered. As Professor Calabresi noted, "[a] system that compensates for accidents perfectly once they have occurred but does nothing to prevent them in the first place is obviously not desirable." G. Calabresi, *The Cost of Accidents*, 64 (1975). *See generally*, Note, 58 Ind.L.J. at 696–98.

As another justification for strict liability, comment c to the Restatement also cites the premise that the expense of claims may become a production cost against which liability insurance can be obtained. The validity of that underlying assumption, however, is highly questionable. Insuring their own operations, even without protection against possible claims set in motion by their predecessor's conduct, has proven difficult for many manufacturers. This potential derivative liability, described as a time bomb that can be ticking for as many as fifty years, does not present an easily calculable risk with readily available insurance.

In the mid–1970's, an insurance availability "crisis" occurred. Many businesses experienced skyrocketing premiums for product liability policies, and others were unable to secure coverage at any cost. *See Product Liability Risk Retention Act: Hearings on H.R. 2120 Before the Subcommittee on Commerce, Transportation and Tourism of the House Committee on Energy and Commerce*, 97th Cong., 1st Sess. 97–11 (1981).

The tightening of the products liability insurance market was one of the influential forces behind the passage of the Product Liability Risk Retention Act of 1981. That legislation permits the formation of risk retention groups within an industry to insure and disperse the products liability of its members. 15 U.S.C. §§ 3901, 3092.

Although some risk retention groups have been formed, the problem has proved to be a tenacious one. A Department of Commerce report, submitted when the 1981 legislation was pending, noted that even though the availability problems of the 1970's had eased in some industries, "[t]his situation cannot be expected to continue." The product-related losses continue to increase, and declining interest rates will produce "a very difficult market for product liability insurance." H.Rep. No. 190, 97th Cong., 1st Sess. 24, *reprinted in* 1981 U.S. Code Cong. & Ad.News 1432, 1453.

The accuracy of that prediction is borne out by a later report of the Attorney General's Tort Policy Working Group, submitted to Congress in support of proposed revisions in tort law. The report, which addresses the liability insurance industry generally, identifies three problems currently facing businesses: "availability of insurance, affordability of insurance coverage and adequacy of coverage." *Report of the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability and Affordability*, 6 (1986).

That insurance coverage, one of the underlying premises of § 402A. has proved to be a source of considerable difficulty also counsels against the extension of liability to entities that have no actual causal connection with the loss.[7]

■ As noted earlier, after thoughtful examination of the extensions advocated by a minority of jurisdictions, the district judge rejected the concept of product line liability. We agree with that decision in light of the serious shortcomings in the reasoning used to support the theory. Unlike the district judge, however, we also reject the continuity of enterprise theory because it too proposes an ill-considered extension of liability to an entity having no causal relationship with the harm. To the extent that the continuity of enterprise ap-

---

**7.** Whether a successor corporation can obtain products liability insurance to cover an accident which occurs when the company is no longer producing the allegedly defective goods is not established in this record.

proach reaches beyond the traditional exceptions, it violates the established principle of corporate liability grounded on the continued existence of that entity.

The district judge candidly stated that the presence of the indemnity agreement between Clark and Armour figured prominently in his decision to adopt the continuity of enterprise theory. That agreement would require Armour, which was the sole stockholder of Baldwin and thus closely connected with the harmful conduct, to pay any judgment. Assuming that Armour is solvent or adequately insured, the ultimate financial responsibility would rest where the district court thought it belonged.

That the value of a shareholder's interest might be diminished by obligations of the company is neither novel nor inequitable. The difficulty lies in the fact that plaintiff did not sue Armour but brought the action against Clark.[8]

On an ad hoc basis, the district court's decision may appear to reach a just result. However, resolution of the issue should follow from a principled rule, not ad hoc rationalization.

The minority doctrines' exclusive focus on the needs of the products liabiltiy plaintiff encourages courts to overlook the equally valid arguments of the business world. Predictability is vital in the corporate field. Unforeseeable alterations in successor liability principles complicate transfers and necessarily increase transaction costs. Shulman, *Commentary: Successor Corporation Liability*, 31 Wayne L.Rev. 135, 142 (1984); Note, *Assumption of Product Liability in Corporate Acquisitions*, 55 B.U.L.Rev. 86, 106 (1975). Major economic decisions, critical to society, are best made in a climate of relative certainty and reasonable predictability.

The imposition of successor liability on a purchasing company long after the transfer of assets defeats the legitimate expectations the parties held during negotiation and sale. Another consequence that must be faced is that few opportunities would exist for the financially troubled company that wishes to cease business but has had its assets devalued by the extension of successor liability.

A company that cannot locate a buyer for all of its assets at a favorable price may be forced to sell its property piecemeal at a less advantageous figure. After dissolution, no successor would exist under any theory of successor liability, and in that event, the products liability plaintiff would still be without a collectable judgment. Thus, the benefits of alienability will have been lost to commerce with no commensurate benefit to plaintiffs.

The district judge made clear in his opinion that Clark should not bear the economic burden but should serve only as a conduit. That possibility, however, flows only from the fortuity that Armour remains in business, apparently capable of satisfying the obligation. But this favorable circumstance will not be present in every case. For example, the indemnifying party itself might well have dissolved or become insolvent when the time for performance arises. Armour's presence and continued vitality do not strengthen the case for expanding successor liability as a general matter.

In short, the district court's justification approximates a rule of law that assesses liability against a motorist because he would be indemnified by an insurance carrier and not because of his wrongful act. Such a profound change in tort law is appropriately the subject of legislation, not judicial fiat.[9]

**8.** Whether Armour could be joined as a third-party defendant and held liable on a claim of indemnity in the plaintiff's suit against Hoffman is not before us.

**9.** We believe that application of the minority theories to the facts here would not produce a finding of liability in any event. Clark did not buy all of Baldwin's assets, or even most of them. No continuity of officers existed after the sale, and no stock was used in payment as in *Knapp*. At the time of the accident, Clark was no longer manufacturing cranes and had not held itself out to the world as a continuation of Baldwin. Clark specifically disclaimed responsibility for product claims. Thus, under either of the minority views, as well as under the

We conclude, therefore, that no theory of corporate successor liability supports the plaintiff's claim against Clark.

## DUTY TO WARN

■ As an alternate ground, plaintiff argues that Clark's liability stems from breach of a duty to warn. Such an approach has been successful in cases involving a continuation of the relationship between the successor and customers of the predecessors. *See Tucker v. Paxson Machine Co.*, 645 F.2d 620 (8th Cir.1981); *Gee v. Tenneco, Inc.*, 615 F.2d 857 (9th Cir. 1980). Although the doctrine is still in the developmental stage. the courts adopting it have looked to such factors as succession to service contracts, coverage of the particular machine by a contract, service of that machine by the successor, and the successor's knowledge of the defect and of the machine owner's location. *See Tucker*, 645 F.2d at 626; *Travis v. Harris Corp.*, 565 F.2d 443, 449 (7th Cir.1977); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 442 (7th Cir.1977).

Some of these factors establish a direct relationship between the customer and the servicing entity and therefore preserve the causation element. The rule follows from the traditional tort concept that a duty to act will not arise in the absence of a relationship between the parties. Note, 58 Ind. L.J. at 705. The successor corporation's liability stems not from its status as a successor, but from its establishment of a relationship with the customer that imposes certain duties and responsibilities. Succession alone does not generate a duty to warn. *Tucker*, 645 F.2d at 626.

We leave for another day whether the duty to warn can be imposed on a successor such as Clark, which is not subject to transfer liability. Even accepting arguen-

do that a duty to warn may attach in that circumstance, we are persuaded that the district court did not err in concluding that no duty arose here.

The record establishes that Clark did not succeed to Baldwin's service contracts and thus did not have one for the machine involved in this case. No evidence suggests that Clark had actual knowledge of the alleged defect. No business relationship existed between Clark and the plaintiff's employer.[10] In these circumstances, the district court properly concluded that no liability could be established on the basis of a duty to warn.

## CONCLUSION

In response to the certified questions, therefore, we answer that the district court did err in granting the plaintiff's motion for partial summary judgment on the basis of a continuity of enterprise exception to the general rule of corporate successor liability. The district court did not err in granting defendant Clark's motion for partial summary judgment on the basis of a failure to establish a duty to warn.

Accordingly, the case will be remanded to the district court for entry of judgment in favor of defendant.

MANSMANN, Circuit Judge, concurring and dissenting.

I concur with the majority that the district court properly granted the motion of Clark Equipment Company ("Clark") for partial summary judgment since Clark had no duty to warn the plaintiff of the allegedly dangerous condition of the crane. However, because the continuity of enterprise theory should govern this case, and since the record can support Polius's cause of action, I dissent from the majority's

---

traditional rule, Clark is not Baldwin's successor.

10. Plaintiff argues that because Clark had the design drawings for the crane, it had constructive knowledge of the defect. A similar argument suggests that Clark could have discovered the crane owner's identity and location through Hoffman's records. Plaintiff offers no support

for its constructive knowledge argument, and the courts discussing a duty to warn have required actual knowledge of the defect and an established relationship with the owner. *See, e.g., Travis*, 565 F.2d at 449; *Leannais*, 565 F.2d at 442; *Pele v. Bendix Machine Tool Corp.*, 111 Mich.App. 343, 314 N.W.2d 614 (1981).

holding that the district court erroneously granted the plaintiff's motion for partial summary judgment.

## I.

Historically, the authorities uniformly agreed that the scope of a successor corporation's liability for claims against its predecessor turned upon the form of the acquisition. If the entities merged, the successor thereby undertook the target's liabilities.

When a corporation purchased another company's assets, though, the transferee usually avoided its transferor's liabilities. The purchaser remained liable, however, where: (1) it expressly or impliedly assumed liability; (2) the transaction amounted to a consolidation or merger; (3) the parties fraudulently intended to escape liability; or (4) the purchaser was a mere continuation of the transferee. *See* 15 Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7122 (rev.perm.ed. 1983).

These exceptions originated in the tax assessment context without intending to circumscribe the accountability of successor corporations in tort. *See Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1152 & nn. 12–13 (1st Cir.1974). Nonetheless, most courts have rigidly applied the exceptions in strict liability suits like the present. In response to this "procrustean application of formalities," *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 369 (3d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975), some jurisdictions have expanded the exceptions to successor corporation immunity. The continuity of enterprise doctrine represents one such rule. The district court rejected a second, the product line theory, and did not certify the issue to us. *Polius v. Clark Equipment Co.*, 608 F.Supp. 1541, 1544–45 (D.V.I.1985).

The plaintiffs conceded before the district judge that none of the traditional exceptions describes Clark's acquisition of the Construction Equipment Division ("CED") of Baldwin-Lima-Hamilton Corporation ("BLH") but proffered the continuity of enterprise doctrine under Virgin Islands law. *Id.* at 1544. The majority now holds, however, that the district court erred in accepting the continuity of enterprise rule as Virgin Islands law and that, in any event, the record could not support a verdict on that theory. I disagree on both counts.

## II.

One best views the continuity of enterprise rule in light of the traditional exceptions to successor corporation immunity and in juxtaposition to the product line theory.

Two of the original exceptions derive more from the express intentions of the entities involved before their transaction than from its structure. Where a purchasing corporation assumes its transferor's liabilities or fraudulently aims by its acquisition to dodge them, it thereby waives its immunity. Neither circumstance exists here. When, however, the transferee merely continues or *de facto* merges with its predecessor, the law transports the transferor's liabilities with its assets.

The *de facto* merger doctrine subsumes the mere continuation theory. A *de facto* merger requires:

(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the

uninterrupted continuation of normal business of operations of the seller corporation. *Shannon v. Samuel Langston Co.*, 379 F.Supp. 797, 801 (W.D.Mich.1974), *citing McKee v. Harris Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98 (1970), *aff'd*, 118 N.J.Super. 480, 288 A.2d 585 (1972), *quoted in Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873, 879 (1976). *See Knapp*, 506 F.2d at 365–66.

In a mere continuation, however; "the test is not the continuation of the business operation but the continuation of the corporate entity." *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir.1977), *quoting National Dairy Products Corp. v. Borden Co.*, 363 F.Supp. 978 (E.D.Wis.1973). *Accord Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458, *reh'g denied*, 765 F.2d 154 (11th Cir.1985). A continuation demands "a common identity of stock, directors, and stockholders and the existence of only one corporation at the completion of the transfer." *Travis*, 565 F.2d at 447. *Accord Bud Antle, Inc.*, 758 F.2d at 1459; *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 625–26 (8th Cir.1981); *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 693 (1st Cir.1984). The doctrine, then, excepts the identity of personnel, physical location, and general business operations required in a *de facto* merger.

Against this background, the continuity of enterprise theory appears less radical than the product line rule of *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). As the New Jersey Supreme Court has explained:

> *Ray* completely abandons the traditional rule and its exceptions, utilizing instead the policies underlying strict liability in tort for injuries caused by defective products.... [T]he *Ray* test is concerned not with the continuation of the corporate entity as such but rather with the successor's undertaking to manufacture

essentially the same line of products as the predecessor.

*Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811, 819 (1981).

The Michigan Supreme Court in *Turner*, by comparison, expressly adopted the first, third, and fourth of the *de facto* merger criteria to define the continuity of enterprise doctrine. *Turner*, 244 N.W.2d at 883. *Turner* drew four guidelines from these criteria:

> 1) the acquiring corporation retains the target's key personnel, production facilities, and general business operations;
> 2) the transferor dissolves following the acquisition;
> 3) the purchaser assumes the seller's liabilities and obligations necessary to continue its normal operations;
> 4) the transferee holds itself out to the world as the continuation of the transferor.

*Id.* at 883–84. *See Mozingo v. Correct Manufacturing Corp.*, 752 F.2d 168, 175 & n. 10 (5th Cir.1985).

Yet despite their differences in approach, the continuity of enterprise and product line theories share a principled refusal to require shareholder continuity for successor corporation liability. The majority decries that position as exacerbating a supposed liability crisis. I address these concerns in light of the policies underlying the continuity of enterprise doctrine.

## III.

### A.

Virgin Islands law looks first to the Restatements of the Law absent a relevant statute. *See* V.I.Code Ann. tit. 1, § 4 (1967). The emerging exceptions to successor corporation immunity derive in part from the risk spreading aim implicit in the Restatement (Second) of Torts § 402A (1965).[1] *See id.*, comment c. Accordingly,

---

1. Section 402A provides:
   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to
   
   liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

the Court of Appeals for the First Circuit observed:

> The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.

*Cyr,* 501 F.2d at 1154. *See Turner,* 244 N.W.2d at 881. Insofar as the Restatement controls the outcome here, this policy should guide our judgment.

Moreover, strict product liability properly attends the accumulated goodwill which the acquiring corporation exploits. *See Cyr,* 501 F.2d at 1154; *Turner,* 244 N.W.2d at 881; *Ramirez,* 431 A.2d at 817. Justice similarly estops an entity that maximizes profits by holding itself out as continuing another enterprise from denying its heritage to skirt tort liability. *See Turner,* 244 N.W.2d at 882; *Trimper v. Bruno-Sherman Corp.,* 436 F.Supp. 349, 351 (E.D. Mich.1977); *Salvati v. Blaw-Knox Food & Chemical Equipment, Inc.,* 130 Misc.2d 626, 497 N.Y.S.2d 242, 247 (1985). *Cf.* Restatement (Second) of Torts § 400 (1965) ("[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer").

In addition, the absence of stock as consideration in a corporate acquisition should not flatly preclude the successor's strict liability in tort for the transferor's products. Several courts, concededly, have viewed the identity of shareholders as the "ultimate justification" for successor corporation liability. *Manh Hung Nguyen v. Johnson Machine & Press Corp.,* 104 Ill. App.3d 1141, 60 Ill.Dec. 866, 872, 433 N.E.2d 1104, 1110 (1982). *See Bud Antle, Inc.,* 758 F.2d at 1458–59; *Dayton,* 739 F.2d at 693; *Tucker,* 645 F.2d at 625–26 & n. 15; *Travis,* 565 F.2d at 447; *Florum v. Elliot Manufacturing Co.,* 629 F.Supp. 1145 (D.Colo.1986); *Parson v. Roper Whitney, Inc.,* 586 F.Supp. 1447 (W.D.Wis.1984); *Armour-Dial, Inc. v. Alkar Engineering Corp.,* 469 F.Supp. 1198 (E.D.Wis.1979); *Woody v. Combustion Engineering, Inc.,* 463 F.Supp. 817 (E.D.Tenn.1978); *Fish v. Amsted Industries, Inc.,* 126 Wis.2d 293, 376 N.W.2d 820 (1985); *Downtowner, Inc. v. Acrometal Products, Inc.,* 347 N.W.2d 118 (1984); *Bernard v. Kee Manufacturing Co., Inc.,* 409 So.2d 1047 (1982). These decisions, however, lack support in both fact and policy.

The case for stockholder continuity rests on the premise that, since a corporation's fortunes ultimately affect its shareholders, they should not continue to enjoy the profits of their enterprise following its merger into another company while escaping the predecessor's pre-merger liabilities. *See Manh Hung Nguyen,* 60 Ill.Dec. at 872, 433 N.E.2d at 1110. As *Turner* observes, however:

> [t]he proportionate number of shares paid out by the acquiring corporation may be very small in a corporate assets purchase, and usually is, so that the strength of commonality of ownership is quite minimal. The continuity of shareholders is apt to be a paper one, more symbolic than real. The actual owners of shares at the time of manufacture of the alleged defective product and the ac-

---

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

---

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

tual owners at the time of sale of the corporation assets may be entirely different individuals.

244 N.W.2d at 880.

## B.

The majority attacks the continuity of enterprise doctrine on several grounds. First, my colleagues inexplicably question "whether the costs of piecemeal measures like § 402A exceed the societal benefits...." At once, though, they brand the continuity of enterprise theory an example of "judicial fiat." The majority's comments appear incongruous since the Virgin Islands has adopted the Restatement as law. *See* V.I.Code Ann. tit. 1, § 4 (1967). Insofar as § 402A welcomes the continuity of enterprise theory, then, the majority assumes the role of the legislature in rejecting it.

Second, the majority contends that, "[e]ven accepting § 402A as sound," § 402A requires a causal relationship between the defendant's act and the plaintiff's injury. This argument begs the question: should we deem Clark the continuation of BLH? *See Turner*, 244 N.W.2d at 881, *citing Cyr*, 501 F.2d at 1153. Nothing in § 402A insulates Clark from strict product liability if we answer affirmatively. *See Bonee v. L & M Construction Chemicals*, 518 F.Supp. 375, 382 (M.D.Tenn.1981).

My colleagues insist that § 402A presupposes the availability of liability coverage; an insurance "crisis," they continue, has outstripped the benefits of § 402A and of its derivative doctrines. Yet, even assuming a liability crisis, the desirability *vel non* of § 402A remains a legislative matter. Moreover, parties to corporate acquisitions—small businesses, in particular—may address the risk of uninsurable product liability judgments in their sale negotiations by reducing purchase prices, creating escrow accounts, or entering into indemnification agreements. *See Cyr*, 501 F.2d at 1154; *Turner*, 244 N.W.2d at 883; *Ray*, 560 P.2d at 11; *Ramirez*, 431 A.2d at 817. Businesses might also form self-insurance cooperatives or seek group coverage to defray costs.

Here, in fact, BLH jointly and severally with its parent, Armour and Company ("Armour"), contracted to indemnify Clark for, *inter alia*, product liability claims. The district court noted the importance to its decision that BLH and Armour ultimately would bear an adverse judgment against Clark. *Polius*, 608 F.Supp. at 1546. Now the majority refuses to expand the traditional theories of successor enterprise liability on the "fortuity that Armour remains in business, apparently capable of satisfying the obligation." The presence of an indemnity agreement, howver, ideally fits this case for the continuity of enterprise doctrine. On the one hand, any loss will fall upon the entity more responsible (as the majority sees it) for the allegedly defective crane. The parties apparently contemplated this result when they negotiated the acquisition. On the other hand, future litigants would suffer no surprise when subjected to the continuity of enterprise theory pursuant to Virgin Islands law.

In short, I find the continuity of enterprise doctrine tacitly extant in § 402A. To that extent the majority usurps the legislative role in declining to acknowledge the doctrine. Even conceding *arguendo* that its applicability remains an open question, I believe we should recognize the theory as the better common law rule. *See Wells v. Rockefeller*, 728 F.2d 209, 216–17 (3d Cir. 1984), *cert. denied*, 471 U.S. 1107, 105 S.Ct. 2343, 85 L.Ed.2d 858 (1985).

## IV.

The majority finally notes that the application here of the continuity of enterprise theory could not produce a judgment for Polius in any event. On review of a summary judgment motion,

[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. The nonmovant's allegations must be taken as true and, when these assertions conflict

with those of the movant, the former must receive the benefit of the doubt. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976) (footnote omitted), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), *quoted in Gans v. Mundy,* 762 F.2d 338, 340 (3d Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). Mindful of this standard, I must part with my colleagues.

The facts here evince *Turner's* guidelines for determining the strict product liability of a successor corporation. *See* 244 N.W.2d at 883–84; *supra* page 79. Cases interpreting *Turner,* however, clarify that it merely requires that the totality of a transaction demonstrate basic enterprise continuity; every criterion need not be present. *See, e.g., Korzetz v. Amsted Industries, Inc.,* 472 F.Supp. 136, 143–44 (E.D.Mich.1979) *and Haney v. Bendix Corp.,* 88 Mich.App. 747, 279 N.W.2d 544, 546 (1979) (applying sliding scale analyses).

First, as the district court observed, Clark purchased the Construction Equipment Division of BLH, including "two manufacturing plants and all of the assets necessary to continue the BLH business." 608 F.Supp. at 1546 (footnote omitted). Clark also retained BLH's employees and supervisors. Second, although BLH formally dissolved some five years after Clark acquired the CED, Armour executed a plan to sell BLH *in toto* and carried the CED on its books as inactive following the sale to Clark. Clark may qualify as continuing the BLH enterprise even though Clark bought only the Construction Equipment Division. *See Trimper,* 436 F.Supp. at 350. Third, Clark immediately assumed the CED's liabilities including trade accounts payable, payrolls, vacation pay, contractual obligations, leases, and certain taxes.

Finally, Clark acquired BLH's trade names, patents, trademarks, and goodwill. BLH also agreed to refrain from competing with Clark for five years. Evidence exists, moreover, that Clark's model 450 and 550 cranes bore the Lima name for some time following the transaction with BLH. Clark as well manufactured a model 900–TC crane similar to the model 900–T which allegedly injured Polius.

## V.

The record, then, could support a finding that Clark continued the BLH enterprise and should on that basis bear the liability, if any, for the plaintiff's injuries. I disagree with the majority's analogizing the continuity of enterprise doctrine to assessing liability against a motorist without fault merely because he carries insurance. Unlike the analogy, continuous enterprise liability demands a wrongful act in the first instance. The majority's decision allows the alleged wrong here—the manufacture of an injurious product—to go unpunished. From that result I respectfully dissent.